IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

KIMBERLY SUE VANHOOSE,

     Plaintiff,

v.                                                    CIVIL ACTION NO. 3:19-cv-00679

ANDREW SAUL,
Commissioner of Social Security,

     Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Kimberly Sue Vanhoose ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on September 23, 2019, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Memorandum in Support of Plaintiff's Motion for Judgment of the Pleadings (ECF No. 7) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 8).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 7), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 38 years old at the time of her alleged disability onset date and 42 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 605.)[1] She completed the eleventh grade. (*Id*. at 628.) Most recently, she worked as a home health aide, and she has also been employed as a retail cashier and a telemarketer. (*Id*.) Claimant alleges that she became disabled on July 18, 2014, due to congestive heart failure, supraventricular tachycardia, a defibrillator, high blood pressure, sleep apnea, and anxiety. (*Id*. at 623, 627.)

Claimant protectively filed her application for benefits on March 22, 2016. (*Id*. at 604–08; *see id*. at 84.) Her claim was initially denied on August 1, 2016, and again upon reconsideration on January 6, 2017. (*Id*. at 535–39, 545–47.) Thereafter, on February 3, 2017, Claimant filed a written request for hearing. (*Id*. at 548–49.) An administrative hearing was held before an ALJ on August 16, 2018, in Huntington, West Virginia. (*Id*. at 102–50.) On September 28, 2018, the ALJ rendered an unfavorable decision. (*Id*. at 81–101.) Claimant then sought review of the ALJ's decision by the Appeals Council on November 26, 2018. (*Id*. at 603.) The Appeals Council denied Claimant's request for review on July 29, 2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id*. at 1–7.)

Claimant timely brought the present action on September 19, 2019, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 6.

Commissioner filed an Answer (ECF No. 5) and a transcript of the administrative proceedings (ECF No. 6). Claimant subsequently filed her Memorandum in Support of Plaintiff's Motion for Judgment of the Pleadings (ECF No. 7), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 8). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

### 1. Treatment for Cardiac Conditions During Relevant Period

Due to her "documented ventricular tachycardia with mild [left ventricular] dysfunction with an [ejection fraction] of 40–45%," Claimant underwent a procedure on July 18, 2014, to receive an implantable cardioverter defibrillator ("ICD"). (Tr. at 728–29.) At a follow-up appointment on August 19, 2014, the ICD was functioning normally, and Claimant was directed to increase her medication dosage and monitor her blood pressure. (*Id*. at 884–85.)

On November 8, 2014, Claimant presented to the emergency room after her ICD "fired" six times when she was "getting excited" at an event. (*Id*. at 745, 752.) She reported experiencing "increased shortness of breath and [heart] palpitations" during the "last few weeks." (*Id*. at 745.) At the emergency room, Claimant's "blood pressure was found to be high." (*Id*.) She also "had some chest discomfort secondary to the shock." (*Id*. at 742.) After she was admitted to the hospital, Claimant was given medication, and her "blood pressure came down nicely without any event." (*Id*.) Her ICD settings were adjusted, and she "had no further episode of arrhythmia or [ICD] firing." (*Id*. at 742–43.)

The physician did not recommend further cardiac testing.  (*Id.* at 743.)  Upon discharge on November 10, 2014, Claimant "was doing well."  (*Id.*)  When she presented to her cardiology provider on November 20, 2014, for a follow-up appointment, a physical examination was unremarkable, and her ICD was functioning normally.  (*Id.* at 887–88.) Claimant was instructed to modify her medications and her diet.  (*Id.* at 888.)

Several weeks later, on December 8, 2014, Claimant again presented to the emergency room, complaining of chest pain that came on "suddenly" and radiated to her neck.  (*Id.* at 2010.)  She also reported nausea and shortness of breath.  (*Id.*)  Upon physical examination, her heart and lungs were normal.  (*Id.* at 2011.)  Imaging of her chest revealed a "[s]table cardiac pacer" and "[n]o acute cardiopulmonary process."  (*Id.* at 2032.)  A heart attack was "ruled out," and it was believed that Claimant was suffering from "musculoskeletal neck and chest pain with superimposed anxiety."  (*Id.* at 2033.) She was discharged and instructed to follow up with her cardiologist.  (*Id.*)  When she next saw her cardiology provider on January 6, 2015, he prescribed a new medication and noted that her ICD was functioning normally and that her "hypertension [was] controlled."  (*Id.* at 895.)

Claimant next presented to her cardiologist on April 30, 2015, complaining of swelling in her ankles.  (*Id.* at 901.)  She was instructed to stop using one of her medications, to continue to monitor her blood pressure, and "to try to walk more this summer." (*Id.* at 902.)  She returned on November 4, 2015, complaining of shortness of breath.  (*Id.* at 904.)  She stated that she "is watching her diet and trying to lose weight." (*Id.*)  The cardiology provider ordered bloodwork, an echocardiogram, and a pulmonary function test.  (*Id.* at 906–07.)  The echocardiogram showed normal left ventricular function with an ejection fraction of 63% or 64% and "[m]ildly elevated" blood pressure.

(*Id.* at 1015–16.)  The pulmonary function test showed "[m]inimal airway obstruction" and was normal.  (*Id.* at 1437.)

On February 23, 2016, Claimant presented to the emergency room, complaining of chest pain "in the anterior chest wall" similar to episodes she had experienced "for the past week."  (*Id.* at 2097.)  Her heart and lungs were normal upon physical examination.  (*Id.* at 2098.)  She was transferred to another hospital for treatment.  (*Id.* at 2100.)  A physical examination of Claimant's heart and lungs after transfer was normal.  (*Id.* at 1229.)

Claimant presented to her cardiologist for a routine appointment on May 12, 2016.  (*Id.* at 1377.)  She reported that she was "doing okay" and "trying to lose weight and trying to walk more."  (*Id.*)  She also stated that she had recently been to the hospital for chest pain, but a heart attack was "ruled out."  (*Id.*)  Upon physical examination, Claimant's heart and lungs were normal.  (*Id.* at 1379.)  She was instructed to continue her medication and return in one year.  (*Id.* at 1381.)

On August 15, 2016, Claimant presented to her primary care provider, complaining of low blood pressure.  (*Id.* at 1308.)  Upon physical examination, her heart and lungs were normal.  (*Id.* at 1309.)  She was directed to exercise for forty-five minutes to an hour five to six days per week and to eat a low-sodium diet.  (*Id.* at 1309–10.)  She was also prescribed medication.  (*Id.* at 1310.)

Claimant returned to her primary care provider on September 9, 2016, complaining of "pain when she takes deep breaths" that "radiates to throat/jaw" and began the previous evening.  (*Id.* at 1306.)  The provider noted that Claimant "is very anxious . . . and states she is not able to catch her breath."  (*Id.*)  She recommended that Claimant go to the emergency room.  (*Id.*)  Claimant was admitted for observation.  (*Id.*

at 1330.)  After testing, her chest pain was determined to be "clearly musculoskeletal." (*Id.* at 1351.)  She was discharged but instructed to follow-up with her primary care provider "for right trace pleural fluid" that appeared on imaging of her chest.  (*Id.* at 1352.) The scan ordered by her primary care provider showed "[n]o pleural effusion."  (*Id.* at 1314.)

On April 21, 2017, Claimant presented to her primary care provider and complained of fatigue, weakness, nausea, dizziness, and "tingling" in her right arm.  (*Id.* at 1730.)  She also reported experiencing chest pain and shortness of breath several days prior.  (*Id.*)  Her heart and lungs were normal upon physical examination.  (*Id.* at 1731– 32.)  She was diagnosed with benign paroxysmal vertigo and prescribed medication for dizziness and nausea.  (*Id.* at 1732.)  She was also instructed to drink fluids and rest.  (*Id.* at 1733.)  She refused a referral to a specialist for treatment.  (*Id.*)  On June 19, 2017, Claimant returned to her primary care provider, complaining of cough, congestion, and rapid heartbeat.  (*Id.* at 1734.)  Upon physical examination, her heart and lungs were normal.  (*Id.* at 1735.)  An electrocardiogram was normal, but Claimant was directed to follow-up with her cardiologist.  (*Id.* at 1736.)

Claimant presented to the emergency room on September 5, 2017, complaining of "aching, burning" chest pain that radiated into her left arm and was accompanied by nausea.  (*Id.* at 1572.)  She underwent an electrocardiogram, which was abnormal.  (*Id.* at 1564.)  Chest imaging was unremarkable, although a hiatal hernia was noted.  (*Id.* at 1563, 1565–66.)  Claimant reported continued pain and requested an echocardiogram but was informed that the hospital performed the procedure only on an outpatient basis.  (*Id.* at 1577.)  Eventually, Claimant left the hospital "against medical advice."  (*Id.* at 1579.)  She stated an intention to call her cardiologist the following morning.  (*Id.* at 1578.)  Several

6

days later, on September 7, 2017, Claimant presented to a different hospital's emergency room "because she was concerned she was getting pneumonia." (*Id.* at 1720.) She was admitted "for observation" due to her chest pain. (*Id.*) The physician determined that Claimant was suffering from an upper respiratory tract infection, and her chest pain was "noncardiac." (*Id.* at 1722.)

On February 20, 2018, Claimant presented to her primary care physician for a routine appointment and complained of "feeling exhausted" and "weak" with shortness of breath on exertion for the previous two months. (*Id.* at 1752.) Upon physical examination, her heart and lungs were normal. (*Id.* at 1753–54.) It was noted that she had an appointment with her cardiologist for a stress test. (*Id.* at 1755.) The next day, on February 21, 2018, Claimant presented to the emergency room complaining of "left-sided chest tightness without radiation . . . associated with nausea and dizziness as well as palpitations." (*Id.* at 1619.) Her heart and lungs were normal upon physical examination, and the physician recommended a nuclear stress test. (*Id.* at 1620–21.) The stress test was normal, and Claimant was discharged in "stable" condition. (*Id.* at 1701, 1704.) It was also recommended that she have a gallbladder ultrasound after leaving the hospital, but the results were "[u]nremarkable." (*Id.* at 1621, 1660.)

On March 26, 2018, Claimant presented to a new cardiologist after a referral from her primary care physician. (*Id.* at 1707, 1821.) Her heart and lungs were normal upon physical examination. (*Id.* at 1708.) She was counseled on a proper diet and encouraged to walk for thirty to forty minutes each day. (*Id.*) The cardiologist prescribed medication and directed her to return in six weeks. (*Id.* at 1709.) She later reported to her primary care physician that she "took herself off" the medication "due to side effects." (*Id.* at 1756.) Claimant returned on May 24, 2018, for a routine appointment. (*Id.* at 1780.) Upon

physical examination, her heart and lungs were normal.  (*Id.* at 1781.)  She was again counseled on "healthy lifestyle choices" and encouraged to "be as active as possible."  (*Id.*)  The cardiologist also modified her medication.  (*Id.* at 1782.)

Claimant presented to the emergency room on July 15, 2018, complaining of chest pain "that has waxed and waned for the last 12 hours."  (*Id.* at 2191.)  However, she stated that the pain "is now resolved."  (*Id.*)  Her heart and lungs were normal upon physical examination.  (*Id.* at 2191–92.)  However, she was admitted for observation in stable condition.  (*Id.* at 2194.)  It was believed that Claimant's chest pain was not "in any way cardiac," and further testing was not recommended.  (*Id.* at 2181.)  She was directed to follow up with her cardiologist and her gastroenterologist.  (*Id.*)  An ultrasound of Claimant's left leg on July 19, 2018, revealed "[n]o evidence of deep venous thrombosis."  (*Id.* at 2125.)

### 2.  *Treatment for Gastrointestinal Conditions During Relevant Period*

On December 10, 2014, Claimant presented to her primary care provider, complaining of "[c]hest tightness, up to sore throat."  (*Id.* at 1217.)  She explained that she had gone to the emergency room several days prior and was told she had a panic attack, but she was "not feeling any better."  (*Id.*)  Her primary care provider suspected that her symptoms were caused by acid reflux.  (*Id.* at 1219.)

Claimant presented to her gastroenterologist on January 6, 2015, complaining "of her throat closing off when she swallows."  (*Id.* at 767.)  The gastroenterologist noted that she had experienced "heartburn for more than 5 years."  (*Id.*)  He scheduled her to undergo an upper endoscopy "if okay with her cardiologist."  (*Id.*)  The procedure was conducted on January 16, 2015, and it revealed a "[s]lightly irregular Z-line, [a] large hiatal hernia, [and] mild gastritis."  (*Id.* at 772.)  A biopsy indicated "mixed acute and

chronic inflammation." (*Id.* at 770.) Claimant also had "a small area of Barrett's esophagus . . . secondary to acid reflux." (*Id.* at 952.) She was directed to continue her heartburn medications, and her gastroenterologist recommended she undergo another upper endoscopy in two years. (*Id.* at 772, 952.)

On March 2, 2016, Claimant presented to her primary care provider and reported that she had recently been hospitalized for "chest pains and tightness" that was thought to be related to her gastrointestinal issues. (*Id.* at 1202.) Her provider refilled her heartburn medications and ordered an abdominal ultrasound, which was conducted on March 11, 2016, and revealed steatosis of the liver. (*Id.* at 1204, 1316.) He also counseled Claimant on avoiding "foods that aggravated symptoms" and caffeine, eating "smaller meals and avoid eating or drinking 2 hours before bedtime," and weight reduction. (*Id.* at 1203.)

On December 1, 2016, Claimant presented to her gastroenterologist for a routine appointment. (*Id.* at 1369.) He ordered an upper endoscopy "for surveillance" and instructed Claimant "to try to lose weight with diet and exercise." (*Id.*) The endoscopy revealed inflammation with no associated bacteria and "some reflux changes" but no Barrett's mucosa. (*Id.* at 1368.) Claimant's gastroenterologist instructed her to continue her medication "along with antireflux measures." (*Id.*)

Claimant presented to the emergency room on March 19, 2017, complaining of abdominal pain and diarrhea that "occurred suddenly" three days prior after eating at a restaurant but had not improved. (*Id.* at 1588, 1592.) She was diagnosed with gastroenteritis and discharged the same day. (*Id.* at 1590.)

At a routine appointment with her primary care provider on May 22, 2018, Claimant complained of heartburn. (*Id.* at 1756.) Her abdomen was observed to be

normal upon physical examination. (*Id.* at 1758.) She was directed to eat a proper diet, begin regular exercise, and lose weight. (*Id.* at 1760.)

Claimant presented to a new gastroenterologist on July 24, 2018, for treatment for her hiatal hernia, epigastric pain, and Barrett's esophagus. (*Id.* at 2135.) A physical examination of her abdomen was normal. (*Id.* at 2137.) The gastroenterologist changed her heartburn medication and ordered testing, which was normal. (*Id.* at 2137–39.)

### 3. *Mental Health Treatment*

On March 9, 2015, Claimant presented to her primary care provider and reported that her cardiologist had prescribed an antidepressant "but said family dr. would continue." (*Id.* at 1269.) She stated that she was not using the medication for a week and a half but "then started feeling bad again." (*Id.*) Her provider observed that she had a euthymic mood and normal affect, with unimpaired thought processes and content. (*Id.* at 1270.) He diagnosed Claimant with anxiety disorder and prescribed an antidepressant. (*Id.*)

Claimant presented to her primary care provider on September 19, 2016, and requested a prescription for her antidepressant. (*Id.* at 1303.) Her provider observed that she had a euthymic mood and normal affect, with unimpaired thought processes and content. (*Id.* at 1304.) He gave her a prescription for the antidepressant. (*Id.* at 1304–05.)

On January 26, 2017, Claimant returned to her primary care provider to request an increase in the dosage of her antidepressant. (*Id.* at 1725.) She was "negative for symptoms" of depression that day. (*Id.*) The physician's psychiatric findings were normal. (*Id.* at 1728.) She was given a refill of her antidepressant and directed to follow up in three months. (*Id.* at 1729.) Claimant's primary care provider's psychiatric findings

were also normal at a routine appointment on July 13, 2017. (*Id.* at 1739.) She reported "[n]o depression" at her next appointment on October 16, 2017, and her physician's psychiatric findings were again normal that day. (*Id.* at 1743, 1745.)

At a routine appointment with her primary care provider on February 20, 2018, Claimant was "negative for symptoms" of depression. (*Id.* at 1752.)

### C.  Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id*. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es]

his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20

C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635).  "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635).  If the claimant can perform other work, the ALJ will find her "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision.  (Tr. at 86.)  He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability.  (*Id.* at 87.)  He found that Claimant's history of cardiomyopathy, gastritis, gastroesophageal reflux disorder, hyperlipidemia, hypertension and obesity constituted "severe" impairments.  (*Id.* at 87–88.)  However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 88–89.)  Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except she can occasionally climb ramps and stairs," "never climb ladders, ropes, and scaffolds," and "occasionally balance, stoop,

14

kneel, crouch, and crawl." (*Id.* at 89.)  In addition, the ALJ found that Claimant "must avoid frequent exposure to extreme cold, extreme heat, wetness, humidity, vibration, fumes, odors, dusts, gasses, and other pulmonary irritants, unprotected heights, moving mechanical parts, and driving a motor vehicle." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was "capable of performing [her] past relevant work as a telemarketer, both as actually performed by [Claimant], and as it is generally performed." (*Id.* at 93.)  Alternatively, he found that Claimant, as "a younger individual" with "a limited education" whose "[t]ransferability of job skills is not material to the determination of disability," is capable of working as a nut and bolt assembler, small parts assembler, or package labeler. (*Id.* at 93–94.)  As a result, the ALJ concluded that Claimant was not "under a disability . . . from July 18, 2014, through the date of this decision." (*Id.* at 94.)

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted).  "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh

conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence.  *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant argues that the ALJ failed to consider the effect of her impairments in combination, particularly as they relate to her shortness of breath and frequent hospitalizations.  (ECF No. 7 at 14–15.)  She further asserts that the ALJ failed to account for her complaints of weakness, fatigue, and dizziness as side effects of her medications.  (*Id.* at 15.)  In addition, she contends that the ALJ failed to apply SSR 02-1p in assessing the severity of her obesity.  (*Id.* at 16–17.)  Claimant also argues that the ALJ disregarded evidence relating to her anxiety and panic attacks.  (*Id.* at 17.)  She asks this Court to reverse the Commissioner's decision and award her benefits or to reverse the Commissioner's decision and remand this matter to the ALJ.  (*See id.* at 19.)[2]  The Commissioner responds that the ALJ properly considered Claimant's impairments in combination when concluding that her impairments did not meet the criteria of a listed impairment at step three, when conducting the RFC assessment, and when finding that she could perform her past relevant work as a telemarketer at step four.  (ECF No. 8 at 10–12.)  He further argues that the ALJ fully accounted for the alleged side effects of Claimant's medications and the impact of her obesity.  (*Id.* at 12–15.)  In addition, the

---

[2] Claimant also argues that the ALJ failed "to produce evidence sufficient to rebut the presumption of disability."  (ECF No. 7 at 17–19.)  However, no such presumption exists.  *Salmons v. Astrue*, No. 3:09-cv-01268, 2011 WL 612866, at *16 (S.D.W. Va. Feb. 11, 2011); *see Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985) ("The ultimate burden to prove disability lies on the claimant.").  Thus, Claimant's argument is without merit.

Commissioner contends that the ALJ correctly found that Claimant's mental impairments were not severe.  (*Id.* at 15–17.)  Finally, he argues that Plaintiff did not satisfy her burden to show that she is unable to perform her past relevant work as a telemarketer.  (*Id.* at 17–18.)

### A. Combination of Impairments

Claimant first argues that the ALJ failed to consider the combined effect of her impairments on her ability to work.  (ECF No. 7 at 14–15.)  Although she mentions her history of cardiomyopathy, gastritis, gastro esophageal reflux disorder, hyperlipidemia, hypertension, and obesity—the impairments the ALJ found to be severe—the specific arguments in her brief relate only to her shortness of breath and frequent hospitalizations. (*Id.*)  And it is unclear whether Claimant challenges the ALJ's conclusion that her impairments in combination did not satisfy a Listing at step three of the sequential evaluation process or his overall evaluation of her functional abilities in the RFC assessment.  (*Id.*)  Regardless, her arguments are without merit.

At the third step of the sequential evaluation process, the ALJ is tasked with determining whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Claimant agrees that "none of [her] impairments equal a listing."  (ECF No. 7 at 14.)  However, she seems to suggest that a Listing would have been satisfied had the ALJ considered her impairments in combination.  (*See id.*)  To that end, "[f]or a claimant to qualify for benefits by showing that his . . . combination of impairments[] is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment."  *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original).  Here,

Claimant points only to her shortness of breath and her frequent hospitalizations. (ECF No. 7 at 14–15.) She does not explain how the evidence she identifies is equal in severity to a listed impairment, nor does she even mention a Listing that her combination of impairments purportedly meets. (*Id*.) Claimant bears the burden to establish that her conditions are equivalent to a Listing, *Shinaberry v. Saul*, 952 F.3d 113, 119 (4th Cir. 2020) ("The burden lies with the claimant to make the requisite showing at the first three steps."), and she has not met that burden here. Moreover, as the Commissioner points out (ECF No. 8 at 11), the ALJ's written decision clearly indicates that he considered whether the combined effects of Claimant's heart conditions, gastrointestinal conditions, and obesity surpassed Listing-level severity. (Tr. at 88–89.) As such, the undersigned **FINDS** that the ALJ properly evaluated Claimant's impairments in combination at the third step of the sequential evaluation process.

Moving on to the RFC assessment, the ALJ must evaluate the claimant's "ability to perform work despite her limitations" in light of "'all' relevant record evidence." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). In doing so, "the ALJ [is] required to consider the combined, synergistic effect of all of Claimant's medically determinable impairments, severe and non-severe, to accurately evaluate the extent of their resulting limitations on Claimant." *Blankenship v. Astrue*, No. 3:11-cv-00005, 2012 WL 259952, at *12 (S.D.W. Va. Jan. 27, 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989)). "The ailments should not be fractionalized and considered in isolation; instead, their cumulative effect should be analyzed to determine the totality of their impact on the claimant's ability to engage in basic work activities." *Id.* (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983)).

18

Here, the ALJ properly reviewed the record evidence, including Claimant's subjective complaints, the medical treatment records from the relevant period, and the medical opinion evidence. (Tr. at 89–93.) Although he did not specifically mention Claimant's complaints of shortness of breath, he noted her testimony that "[s]he has trouble walking a long distance" (*id.* at 90), the functional limitation Claimant associated with her shortness of breath (*id.* at 132–33). He also summarized her treatment for her cardiac conditions, which she claims cause her to experience shortness of breath, during the relevant period. (*Id.* at 90–92.) And his review of the medical evidence included details about Claimant's various hospitalizations throughout that time. (*Id.*) The ALJ clearly considered the evidence Claimant cites in her opening brief in support of her argument that he did not account for the combined effect of her impairments. (ECF No. 7 at 14–15.) Importantly, the ALJ concluded his discussion of Claimant's RFC by giving "great weight" to the opinions of the state-agency medical consultants and partially adopting their RFC assessment because it was reflected in the objective medical evidence. (Tr. at 92–93.) He explained, "The objective medical evidence shows that [Claimant's] physical impairments have been generally stable over the last few years, and have been effectively treated with medication and routine maintenance visits." (*Id.* at 92.) Put simply, there is nothing in the ALJ's analysis to suggest that he did not consider the overall effect of Claimant's impairments on her ability to work. The undersigned **FINDS** that the ALJ properly conducted the RFC assessment.

## B. *Medication Side Effects*

Claimant next argues that the ALJ failed to consider her complaints of fatigue, weakness, and dizziness, which she claims are side effects of her medications. (ECF No. 7 at 15.) As part of the RFC assessment, the ALJ must evaluate a claimant's "statements

and symptoms regarding the limitations caused by her impairments." *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)). To evaluate the disabling effect of an individual's symptoms, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. § 404.1529(c)(1). If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). An individual's subjective complaints about his symptoms, including any side effects of his medication, are relevant to the latter determination. *See id.* § 404.1529(c)(3). The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

Here, the ALJ reviewed Claimant's hearing testimony and mentioned her statements about her fatigue and weakness. (Tr. at 90.) But he ultimately found that while her "medically determinable impairments could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.* at 92.) He explained that "the consistency of her claim" was "undermined" by "[t]he fact that [she] worked after her alleged onset date" and her ability to perform activities of daily living "unassisted." (*Id.*) In other words, the ALJ evaluated Claimant's subjective complaints as the regulations require. Claimant's argument that he did not boils down to an assertion that the ALJ must automatically adopt her subjective

complaints, but that is simply not correct. *See Squires v. Colvin*, No. 1:16-cv-190, 2017 WL 354271, at *5 (M.D.N.C. Jan. 24, 2017) (report and recommendation of magistrate judge) ("[T]he ALJ labors under no obligation to accept Plaintiff's subjective complaints 'at face value.'"); *Plummer v. Astrue*, No. 5:11-cv-00006-RLV-DSC, 2012 WL 1858844, at *3 (W.D.N.C. May 22, 2012) ("[T]he ALJ is not required to accept a claimant's testimony at face value, but rather is to weigh such testimony with all of the evidence."). Therefore, the undersigned **FINDS** that the ALJ appropriately considered Claimant's subjective complaints about the side effects of her medication.

### C. Obesity

Claimant contends that the ALJ failed to account for her obesity in accordance with SSR 02-1p. (ECF No. 7 at 16–17.) "SSR 02-1p mandates that the ALJ consider both the individual and cumulative effects of obesity at steps two through five of the [sequential evaluation process]." *Allen v. Colvin*, No. ADC-16-cv-2557, 2017 WL 2399591, at *6 (D. Md. June 1, 2017); *see* SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002). Here, at step two, the ALJ found that Claimant's obesity constituted a severe impairment because "[m]edical evidence showed [Claimant] was five feet seven inches tall and she weighed 277 pounds, which is considered to be obese." (Tr. at 88.) But at step three, he found that "the medical evidence does not support a finding that [Claimant's] obesity has reached a level that would cause [her] other impairments to meet or medically equal a listed impairment." (*Id.* at 89.) And his review of the medical evidence as part of the RFC assessment documented the changes in Claimant's weight and body mass index throughout the relevant period. (*Id.* at 90–91.) He noted, however, that Claimant worked after her alleged onset date and was able to perform daily activities without assistance. (*Id.* at 92.) The ALJ also accorded "great weight" to the opinions of the state-agency

medical consultants (*id.* at 92), whose RFC assessment explicitly accounted for Claimant's "MORBID OBESITY WITH BMI 42" (*id.* at 519, 531 (emphasis in original)).  The ALJ's written decision reflects that he considered Claimant's obesity at the relevant steps of the sequential evaluation process in accordance with SSR 02-1p.

At its core, Claimant's argument with respect to this assignment of error is identical to her argument with respect to the last: she asserts that she suffers from weakness and fatigue and that "she just cannot get out of bed" some days, negatively "affect[ing] her ability to sustain work activity."  (ECF No. 7 at 16–17.)  But as the undersigned has already explained, the ALJ is not obligated to adopt Claimant's subjective statements and must evaluate her functional abilities by considering the entire record.  *Plummer*, 2012 WL 1858844, at *3.  Notably, as the Commissioner points out, Claimant "has not identified any evidence to show that her obesity resulted in fatigue or limitations greater than those the ALJ accounted for in his [RFC assessment]."  (ECF No. 8 at 15.)  The fact of Claimant's obesity is not itself sufficient to show that she is disabled.  *Hawthorne v. Astrue*, No. 2:10-cv-00069, 2011 WL 5034661, at *9 (W.D. Va. Oct. 24, 2011) ("[A] mere diagnosis is insufficient to constitute a finding of disability.  Instead, it is the functional limitations associated therewith that must be evaluated in making such a finding."), *adopted by* 2011 WL 5526333 (W.D. Va. Nov. 14, 2011).  Accordingly, the undersigned **FINDS** that the ALJ's consideration of Claimant's obesity complies with SSR 02-1p.

D. *Evidence Related to Anxiety and Panic Attacks*

Claimant argues that the ALJ disregarded evidence corroborating her anxiety and panic attacks, specifically her treatment for anxiety, hospitalizations for non-cardiac chest pain, and the poor prognosis given by the consultative psychological examiner.  (ECF No. 7 at 17.)  Based on the cases she cites in her brief, she seems to assert that once she

demonstrates evidence of a "non-exertional disabilit[y]," her testimony about that condition is entitled to a presumption of credibility. (*See id.* (citing *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985); *Nanny v. Matthews*, 423 F. Supp. 548 (E.D. Va. 1976)).)[3]  However, the regulations prescribe that when the claimant alleges a mental impairment, the ALJ must apply a "special technique" to evaluate the severity of that condition, which requires the ALJ to consider the claimant's "pertinent symptoms, signs, and laboratory findings" and "rate the degree of functional limitation resulting from the impairment(s)" according to certain criteria.   20 C.F.R. § 404.1520a(b); *see id.* § 404.1520a(c); *see also Patterson*, 846 F.3d at 659.  The "special technique" does not place a heavier weight on the claimant's testimony about her mental impairment; rather, the ALJ "must take into account all relevant evidence bearing on the claimant's mental condition." *Cook v. Colvin*, No. 2:15-cv-07181, 2016 WL 5661348, at *6 (S.D.W. Va. Sept. 29, 2016).

The ALJ properly applied the "special technique" in this case.  He found that Claimant's mental impairments were not severe because they "do not cause more than a minimal limitation in [her] ability to perform basic mental work activities." (Tr. at 87.) He determined, based on the consultative psychological examiner's findings, that she had only mild limitations in understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace. (*Id.* at 87– 88.)  He further determined, based on Claimant's own statements about her abilities, that

---

[3] Of note, both of these cases deal with the evaluation of a claimant's subjective complaints, and in that regard their continued validity is suspect because they predate *Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996), which interprets the regulations governing the evaluation of a claimant's subjective complaints, by at least a decade.  Further, contrary to Claimant's assertion, "*Craig* does not create or recognize a great weight rule affording the claimant a presumption of credibility at step two of the pain analysis based on a successful showing at step one."  *Smith v. Astrue*, 457 F. App'x 326, 329 (4th Cir. 2011) (per curiam).

she had only a mild limitation in adapting or managing herself. (*Id.* at 88.) Elsewhere in his analysis, the ALJ also explained that he gave "great weight" to the opinions of the state-agency psychological consultants that Claimant "had non-severe mental impairments" because "the overall evidence" showed that Claimant "has only been treated for mental impairments through her primary care physician in the form of medication," and she had "normal mental status" at those appointments. (*Id.* at 92.)

In sum, the ALJ considered the totality of the record evidence and ultimately concluded that Claimant's mental impairments did not impact her functional abilities to the extent she testified. Claimant implies that the ALJ was required to accept as true her testimony about the effects of her anxiety merely because she was treated for anxiety (ECF No. 7 at 17), but that is plainly not correct. *Plummer*, 2012 WL 1858844, at *3 ("[T]he ALJ is not required to accept a claimant's testimony at face value, but rather is to weigh such testimony with all of the evidence."). And any conflicts in the evidence are exclusively the ALJ's to resolve. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) (citing *Kasey v. Sullivan*, 3 F.3d 75, 79 (4th Cir. 1993)). The ALJ's findings that Claimant's mental impairments are not severe are supported by substantial evidence and adequately explained. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (explaining standard of review). As such, the undersigned **FINDS** that the ALJ committed no error.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 7), **GRANT** the Commissioner's request to affirm his decision (ECF No. 8), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Chambers.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: July 2, 2020

Dwane L. Tinsley
United States Magistrate Judge

25